UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------x

AUDREY LUSSORO, on behalf of herself and
all others similarly situated,

                    Plaintiff,

- against -

OCEAN FINANCIAL FEDERAL CREDIT
UNION,

                    Defendant.

----------------------------------------------------------x

**MEMORANDUM & ORDER**
18-CV-7400 (PKC) (ST)

PAMELA K. CHEN, United States District Judge:

Plaintiff Audrey Lussoro[1] brings this action against Defendant Ocean Financial Federal

Credit Union alleging breach of contract and breach of the implied covenant of good faith and fair

dealing claims, as well as violations of New York General Business Law § 349 ("§ 349") and the

Electronic Fund Transfers Act ("EFTA"), 15 U.S.C. §§ 1693 *et seq.*, and its implementing

regulations, known as Regulation E, 15 C.F.R. §§ 1005 *et seq.*[2]  Before the Court is Defendant's

motion to dismiss Plaintiff's amended complaint in its entirety.  For the reasons stated herein,

Defendant's motion is granted in part and denied in part.

---

[1] Plaintiff also brings this action on behalf of a purported class.  (Amended Complaint ("Am. Compl."), Dkt. 28, ¶¶ 65–76.)

[2] Plaintiff alleges, and Defendant does not contest, that the Court has jurisdiction over this action pursuant to the Class Action Fairness Act because at least one of the putative class members and Defendant are diverse and the aggregate claims of the class exceed $5 million.  (Am. Compl., Dkt. 28, ¶ 7.)  The Court agrees.  The Court also notes that it has federal question jurisdiction given that Plaintiff alleges a claim pursuant to EFTA, which is a federal statute.  *See* 28 U.S.C. § 1331.

**BACKGROUND**

I.     **Relevant Facts[3]**

Defendant is one of the largest credit unions in New York, with approximately $600 million in assets.  (Am. Compl., Dkt. 28, ¶ 11.)  Plaintiff has a checking account with Defendant.  (*Id.* ¶ 12.)  Customers with checking accounts, like Plaintiff, are issued debit cards that allow them to have electronic access to their checking accounts for purchases, withdrawals, and other electronic debit transactions.  (*Id.* ¶ 13.)  Plaintiff's checking account is governed by Defendant's standard account agreement ("the Contract").  (*Id.* ¶ 14; *see also* Am. Compl. Exhibit ("Ex.") A, Dkt. 28-1.)  Pursuant to the Contract, Defendant charges a fee of $28 when a debit card transaction overdraws a customer's checking account.  (Am. Compl., Dkt. 28, ¶ 14.)

A debit card transaction occurs in two stages.  (*Id.* ¶ 28.)  First, Defendant must authorize a purchase made by a debit card at the point of sale, *i.e.*, when a merchant "swipes" a customer's card.  (*Id.*)  At that point, Defendant determines whether the customer's account is valid and whether there are sufficient funds in the account to cover the transaction amount.  (*Id.*)  Also at that time, Defendant sequesters the funds necessary to cover these transactions via a "debit hold." (*Id.* ¶¶ 19–20.)  However, these charges are not settled at the same time they are authorized; rather, "[s]ometime thereafter, the funds are actually transferred from the customer's account to the merchant's account," thereby settling the transaction.  (*Id.* ¶ 31.)

Plaintiff alleges that Defendant frequently imposes overdraft fees on debit card transactions that had sufficient funds to cover the transaction at authorization.  (*Id.* ¶¶ 16, 18.)  Defendant allegedly imposes these fees because, even though there may be sufficient funds in an account at

---

[3] The Court assumes the truth of the Amended Complaint's non-conclusory factual allegations.  *See Arar v. Ashcroft*, 585 F.3d 559, 567 (2d Cir. 2009) (*en banc*).

authorization, "sometime thereafter," at the time of settlement, intervening transactions have reduced the amount of funds available in the account so that there are no longer sufficient funds to cover the settling transaction. (*See id.* ¶¶ 16, 18, 31.)  Defendant charges this overdraft fee even though it previously sequestered the funds necessary, via a debit hold, to cover such charges. (*Id.* ¶ 22; *see also id.* ¶ 40 (alleging that Defendant "actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to 'post' those same transactions").)  For example, on July 19, 2018, Plaintiff used her debit card in two transactions, one in the amount of $2.77 and the other in the amount of $3.11. (*Id.* ¶ 63; *see also* Defendant's Supplemental Brief ("Def.'s Supp. Br.") Ex. A,[4] Dkt. 36-1, at ECF[5] 2–3.)  At that time, Plaintiff had sufficient funds in her account to cover these transactions, which were authorized accordingly by Defendant. (*Id.* ¶¶ 17–18, 63–64.)  On July 20, 2018, Defendant, pursuant to its policy of posting different types of charges in a specific order (*see* Am. Compl. Ex. A, Dkt. 28-1, at 4), posted a $197 charge that significantly decreased the amount of money available in Plaintiff's account (Def.'s Supp. Br. Ex. A, Dkt. 36-1, at ECF 2).  Therefore, later on July 20, 2018, when the charges from July 19, that had been previously authorized, were settled, there was not enough money in Plaintiff's account to cover these charges and she was assessed two $28 overdraft fees. (Am. Compl., Dkt. 28, ¶¶ 4, 63–64; Def.'s Supp. Br. Ex. A, Dkt. 36-1, at ECF 2.)  Plaintiff refers to these types of transactions as "Authorize Positive, Purportedly Settle Negative Transactions" or

---

[4] Though Plaintiff's account statement was not included in Plaintiff's Amended Complaint, the Court finds that it can nonetheless rely on it because "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

[5] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

"APPSN Transactions."  (Am. Compl., Dkt. 28, ¶ 15.)  Plaintiff challenges Defendant's practice of charging overdraft fees on APPSN transactions, alleging that they are in violation of the Contract and misleading to the average consumer.  (*Id.* ¶¶ 23, 25–27.)

## II.    Procedural History

Plaintiff filed her original complaint on December 27, 2018.  (Dkt. 1.)  The Honorable Joseph F. Bianco granted Defendant permission to move to dismiss Plaintiff's complaint.  (*See* Feb. 21, 2019 Minute Entry.)[6]  After Defendant served its motion to dismiss, Plaintiff filed an amended complaint.  (Dkt. 28.)  Defendant renewed its request to file a motion to dismiss as to Plaintiff's amended complaint (Dkt. 29), which the Court granted (Apr. 23, 2019 Docket Order).  Defendant's motion to dismiss was fully briefed on June 14, 2019.  (Dkts. 34–38.)  The Court held oral argument on July 9, 2019.  (July 9, 2019 Minute Entry.)  At oral argument, the Court allowed the parties to file supplemental briefs.  (*Id.*; *see also* Dkts. 41–42.)  The parties have since also filed supplemental letters with additional relevant authority.  (*See* Dkts. 43–47.)

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability

---

[6] The case was reassigned to the undersigned on March 11, 2019.  (Mar. 11, 2019 Docket Order.)

requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal citation omitted).

Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (internal citation omitted); *see also Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013). In addressing the sufficiency of a complaint, courts are required to accept the well-pleaded factual allegations contained within the complaint as true, *see Bldg. Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184, 187 (2d Cir. 2012), but "need not credit conclusory statements unsupported by assertions of facts or legal conclusions and characterizations presented as factual allegations," *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2001) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).   Additionally, a court "need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *Id.* at 405–06 (citing *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995)).   At the pleadings stage, a court must limit its inquiry to the facts alleged in the complaint, the documents attached to the complaint or incorporated therein by reference, and "documents that, while not explicitly incorporated into the complaint, are 'integral' to [the] plaintiff's claims and were relied upon in drafting the complaint." *Id.* at 404 (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 44 (2d Cir. 1991)).

## DISCUSSION

Plaintiff brings four claims against Defendant: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) violation of New York General Business Law

§ 349; and (4) violation of EFTA's Regulation E.  (Am. Compl., Dkt. 28, at 17–21.)  The Court addresses each claim in turn.

## I.      Plaintiff's Breach of Contract Claim

Plaintiff alleges that Defendant breached the Contract by charging overdraft fees for Plaintiff's July 19, 2018 transactions, even though Plaintiff had sufficient funds to cover those transactions at the time they were authorized.  (Plaintiff's Memorandum in Opposition ("Pl.'s Opp. Br."), Dkt. 38, at 4–10.)  Defendant argues that Plaintiff's claim fails for two reasons: (1) Plaintiff has waived her claim by failing to report the overdraft charges to Defendant within 60 days, as required by the Contract, and (2) the Contract clearly allows Defendant to charge overdraft fees when an account has insufficient funds to cover a transaction at the time of settlement.  (Def.'s Supp. Br., Dkt. 36, at 2–4.)

### A.      Waiver

Defendant first argues that Plaintiff has waived her breach of contract claim because she failed to report the overdraft fees as an error, as required by the Contract.  (Def.'s Supp. Br., Dkt. 36, at 2; *see also* Am. Compl. Ex. A, Dkt. 28-1, at 3–4 ("In addition to your duty to review your statements for unauthorized signatures, alterations and forgeries, you agree to examine your statement with reasonable promptness for any other error – such as an encoding error.  . . . Failure to examine your statement and items and report any errors to us within 60 days . . . precludes you from asserting a claim against us for any errors . . . .").)  Defendant's argument is unavailing.

First, given that Defendant insists that the overdraft fees are not errors (Def.'s Reply Br., Dkt. 37, at 2 n.1 ("While this contractual provision is addressed to claimed errors, Ocean Financial does not believe that any errors occurred for the reasons otherwise stated in this brief and Ocean Financial's prior briefs.")), the Contract is at least ambiguous as to whether this error provision

applies to a situation where Defendant has intentionally imposed fees. *See Walkingstick v. Simmons Bank*, No. 19-CV-3184 (RK), 2020 WL 249473, at *2 (W.D. Mo. Jan. 16, 2020) (declining to dismiss plaintiff's breach of contract claim based on the same error provision at issue here because the question of whether that provision applied to plaintiff's overdraft fee claim was "dependent on the interpretation and application of the Deposit Agreement") (citation omitted). Furthermore, the cases cited by Defendant in support of its argument address charges that are materially different than the overdraft fees at issue here. For example, in *Catalano v. Marine Midland Bank*, the Second Department found that the plaintiffs had waived a claim against the defendant bank because they did not notify the bank of unauthorized withdrawals. 756 N.Y.S.2d 770, 770 (App. Div. 2003) (Mem). Likewise, in *Qassemzadeh v. IBM Poughkeepsie Emps. Fed. Credit Union*, the Second Department found that "the plaintiff waived his right to bring this action by failing to notify the defendant of the alleged altered draft within 30 days after his account statement was mailed to him, as required by the share draft agreement." 561 N.Y.S.2d 795, 796 (App. Div. 1990). Crucially, in neither *Catalano* nor *Qassemzadeh* did the plaintiffs allege that the error at issue was made by the defendant bank. Here, the alleged error was made by Defendant itself. "New York common law will not require strict compliance with a contractual notice-and-cure provision if providing an opportunity to cure would be useless, or if the breach undermines the entire contractual relationship such that it cannot be cured." *Giuffre Hyundai, Ltd. v. Hyundai Motor Am.*, 756 F.3d 204, 209 (2d Cir. 2014) (footnote and citations omitted). The Court finds that enforcing strict compliance with the notice-and-cure provision would be useless with respect to the alleged error in this case, given that Defendant was aware of the charges and insists that the overdraft fees are not, in fact, errors. Accordingly, the Court does not find that Plaintiff has waived her ability to bring her breach of contract claim against Defendant.

## B.      Failure to State a Breach of Contract Claim

Defendant also argues that Plaintiff has failed to state a claim for breach of contract because the Contract unambiguously allows Defendant to impose overdraft fees if, at the time of settlement, a bank account has insufficient funds to cover a transaction.[7]  (Def.'s Supp. Br., Dkt. 36, at 2–4.) "To state a claim for breach of contract under New York law, a complaint must allege four elements: '(1) the existence of an agreement, (2) adequate performance of the contract by plaintiff, (3) breach of the contract by defendant, and (4) damages.'"  *Donnenfeld v. Petro, Inc.*, 333 F. Supp. 3d 208, 218 (E.D.N.Y. 2018) (quoting *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)).  "At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016) (citation omitted).  "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (internal quotation marks and citations omitted).  A contract is ambiguous under New York law "if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context

---

[7] Defendant does not address the second aspect of Plaintiff's breach of contract theory: that Defendant can never impose an overdraft fee when it settles a debit card transaction because it should always have the funds from the debit hold to cover that charge.  (*See* Am. Compl., Dkt. 28, ¶ 22.)  Given that this argument depends on whether Defendant is able to impose overdraft fees at the time of settlement in the first instance, the Court finds that Plaintiff has necessarily adequately stated a claim as to this basis as well, given the Court's analysis *infra*.  *See Lloyd v. Navy Fed. Credit Union*, No. 17-CV-1280 (BAS) (RBB), 2018 WL 1757609, at *8 (S.D. Cal. Apr. 12, 2018) ("However, accepting that [p]laintiffs' breach of contract claim implicates the posting order, the Court is not persuaded that the posting order forecloses [p]laintiffs' claim.  The order in which transactions post to an account does not resolve whether funds previously sequestered for a transaction authorized and approved into positive funds are used 'to cover' that transaction when it settles.  As [p]laintiffs observe, if a temporary hold lasts until the transaction posts, then their previously posted ATM withdrawals could not consume funds sequestered from positive funds.") (internal record citation omitted).

8

of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co., N.A.*, 773 F.3d 110, 114 (2d Cir. 2014) (internal quotation marks and citation omitted). Conversely, "[n]o ambiguity exists where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Id.* (internal quotation marks and citation omitted).

Here, the Court finds that the Contract is ambiguous as to whether Defendant is allowed to impose overdraft fees on APPSN transactions. The Contract states, in a section titled "Overdrafts," that "[y]ou understand that we [Defendant] may, at our discretion, honor withdrawal requests that overdraw your account." (Am. Compl. Ex. A, Dkt. 28-1, at 2.) The Contract also states that, "[i]f an item is presented without sufficient funds in your account to pay it, we [Defendant] may, at our discretion, pay the item (creating an overdraft) or return the item (NSF)." (*Id.* at 4.) The Court agrees with Plaintiff that both of these provisions appear to allow Defendant to only impose overdraft fees at the time of authorization. At the very least, the Court finds that the language is ambiguous because the Contract does not define at what point in time an item "is presented," *i.e.*, whether an item is presented at the point of authorization, when a consumer is engaging in a transaction with a merchant, or at the point of settlement, when the merchant is seeking payment from the bank. Either interpretation of "is presented" is plausible.[8]   Therefore, Plaintiff has

---

[8] The Court notes that Plaintiff's claim is also supported by the language of the Opt-In Form, which states that, if a Plaintiff does not authorize Defendant to pay overdrafts, she "will not be able to withdraw at an ATM, perform debit card transactions or pay overdrafts on [her] checking [account] when the funds are not available." (Am. Compl. Ex. B, Dkt. 28-2.) The language of this form also appears to link the imposition of overdraft fees to the point in time when a transaction is authorized.

presented an alternative reasonable interpretation of the Contract language, *i.e.*, that an item "is presented" at the time of authorization.  This is sufficient to state a breach of contract claim.  *See Roberts v. Capital One, N.A.*, 719 F. App'x 33, 36–37 (2d Cir. 2017) (summary order) (finding that plaintiff adequately stated a breach of contract claim when she offered a plausible interpretation of the contract language different than defendant's also plausible interpretation); *id.* ("[Defendant bank] seems to presume that the 'transaction' in question refers to its settlement with the merchant, which is certainly a plausible reading of the agreement, but it would hardly be implausible for a consumer to think that 'a transaction' refers to the consumer's transaction with a merchant, such that the assessment of whether their account holds sufficient funds refers to the funds available at the time that the consumer-merchant transaction is authorized by [defendant bank]."); *Perks v. TD Bank, N.A.*, No. 18-CV-11176 (VEC), 2020 WL 1272246, at *2–3 (S.D.N.Y. Mar. 17, 2020) (denying defendant's motion to dismiss where defendant bank's contract definition of "item" was ambiguous because interpretations of "item" offered by both plaintiff customer and defendant bank were reasonable).

Defendant argues that other language in the Contract makes Plaintiff's interpretation of the Contract unreasonable.  Defendant asserts that the Contract is clear that, while Defendant is allowed to impose an overdraft fee at the time of authorization, it is also allowed to do so at the time of settlement.  For example, the Contract states that

> [w]e may determine the amount of available funds in your account for the purpose of deciding whether to return an item for insufficient funds at any time between the time we receive the item and when we return the item or send a notice in lieu of return.  We need only make one determination, but if we choose to make a subsequent determination, the account balance at the subsequent time will determine whether there are insufficient available funds.

(Am. Compl. Ex. A, Dkt. 28-1, at 2.)  Defendant argues that this language allows it to make a "subsequent" determination about whether to impose an overdraft fee at the time of settlement. (Def.'s Supp. Br., Dkt. 36, at 3.)  Defendant's argument is again unavailing.

First, this language is in a subsection entitled "Checks and withdrawal rules" that immediately precedes the "Overdrafts" subsection.   (Am. Compl. Ex. A, Dkt. 28-1, at 2.) Therefore, it is unclear whether this provision is applicable to overdrafts.  Furthermore, though this language seems to authorize subsequent determinations, the language makes clear that these determinations must occur between the time Defendant "receives" the item and when Defendant decides to either "return the item" or "send a notice in lieu of return."  (*Id.*)  However, in the context of debit card transactions, the decision as to whether to return an item occurs at the point of authorization because, after a bank authorizes a transaction, the bank is obligated to pay the merchant.  *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59045 (Nov. 17, 2009) ("In some circumstances, an institution may be unable to avoid paying a transaction that overdraws a consumer's account.  This can occur, for example, when a debit card transaction is authorized, but intervening transactions reduce the funds in the checking account before the debit card transaction clears.  Under network rules, the institution is required to pay the transaction.").  Therefore, the language from the Contract relied upon by Defendant, far from unambiguously allowing Defendant to impose overdraft fees at the time of settlement, merely adds further ambiguity as to when Defendant is allowed to impose overdraft fees.

Defendant's argument that its ability to post items on Plaintiff's account in a specific order also allows it to impose overdraft fees on APPSN transactions is equally unpersuasive.  The Contract states that "[w]hen processing items drawn on your account, our policy is to pay them in the following order: ACH[] (including Bill Payer), transfers (share, share draft, or loan payments),

and share drafts.  Debit card transactions can post at any time of day."  (Am. Compl. Ex. A, Dkt. 28-1, at 4.)  Defendant argues that this provision makes it clear that debit card transactions will not be settled at the time that they are authorized.  (Def.'s Supp. Br., Dkt. 36, at 3.)  The Court disagrees.  First, this provision does little to explain the true mechanics of how debit card transactions work.  Contrary to Defendant's argument that the Contract language stating that the transaction can "post"[9] at any time of day tells a consumer that a transaction can settle days after it was originally authorized, this language more strongly suggests that a debit card transaction settles "at any time" on the day of the transaction.  Furthermore, to the extent this language suggests that authorization and settlement of a debit card transaction do not occur at the same time, the language fails to provide any clarity regarding at what point Defendant may impose an overdraft fee.

Most importantly, neither the provision in the "Checks and withdrawal rules" subsection nor the "posting" order provision clarify the central issue: whether the Contract language unambiguously communicates that Defendant is allowed to charge overdraft fees at the time of settlement, where the debit transaction was previously authorized.  This is the crucial difference between the instant action and cases like *Chambers v. NASA Fed. Credit Union*, 222 F. Supp. 3d 1 (D.D.C. 2016), and *Domann v. Summit Credit Union*, No. 18-CV-167 (SLC), 2018 WL 4374076, at *4–8 (W.D. Wis. Sept. 13, 2018), which Defendant argues support dismissal in this instant action.  (Def.'s Supp. Br., Dkt. 36, at 3.)  In those cases, the courts found that the relevant contract language unambiguously supported the defendant bank's interpretation of the contract.  In

---

[9] Furthermore, given that the Contract does not define what "post" means, the Court does not find that this provision helps to clarify the key issue at stake: whether the Contract allows Defendant to impose overdraft fees at the time of settlement, in addition to at the time of authorization.

*Chambers*, for example, where the issue was whether a contract required a defendant credit union to use an account's available or ledger balance in determining whether a transaction had overdrawn the account, the Court found that

> [t]he agreements not only use the phrase ["available balance"], but use it in critical provisions dealing specifically with overdrafts and debit transactions—the subject matter of this case. . . . [Therefore,] the relevant agreements unambiguously convey that the [credit union] will impose overdraft fees on debit transactions that overdraw the *available* balance.

222 F. Supp. 3d at 12–13 (emphasis in original).

However, *Chambers* has no application in this case because of material differences between the contract language at issue here and that at issue in *Chambers*. As the Eleventh Circuit explained in *Tims v. LGE Cmty. Credit Union*, in dealing with a similar issue to that in *Chambers*:

> Several significant details distinguish *Chambers* from this case, however. Importantly, in *Chambers*, the Opt-In Agreement used the phrase "available balance." In addition, the Account Agreement in *Chambers* contained a subsection addressing "Available Balances to Make Transactions," which linked the concept of available balance to the mechanics of when and how the bank would assess overdrafts. Finally, the Opt-In Agreement in *Chambers* provided examples illustrating when an account would not have "enough money" and thus be subject to an overdraft.
>
> None of those factors is present in this case. The agreements here did not use the phrase "available balance"; the Account Agreement nowhere explained the mechanics of how and when [defendant bank] would assess overdrafts, nor linked the concept of an "available balance" to those mechanics; and the Opt-In Agreement provided no examples illustrating when a consumer would not have "enough money" to cover a transaction and thereby trigger an overdraft. Because of these three distinctions, we cannot say the Opt-In and Account Agreements in this case clearly demonstrated the parties' intent that [defendant bank] would use the available balance calculation method when assessing overdraft fees.

935 F.3d 1228, 1242 (11th Cir. 2019) (internal citations omitted) (quoting *Chambers*, 222 F. Supp. 3d at 10–11).

The same is true here. The Contract does not use the terms "authorization" or "settlement" to help explain when an overdraft fee can be imposed, it does not link the concepts of authorization

or settlement to the mechanics of when an overdraft fee is assessed, and it does not provide examples showing how a consumer could incur an overdraft fee at the time of settlement. As a result, the Court finds that the Contract is ambiguous as to whether it allows Defendant to impose overdraft fees on APPSN transactions. This conclusion is in line with the decisions of other courts that have likewise found that ambiguous provisions about the method by which banks impose overdraft fees support a claim for breach of contract. *See, e.g.*, *Tims*, 935 F.3d at 1242; *Roberts*, 719 F. App'x at 36–37; *Lloyd*, 2018 WL 1757609, at *7–9; *Pinkston-Polling v. Advia Credit Union*, 227 F. Supp. 3d 848, 854–55 (E.D. Mich. 2016); *Gunter v. United Fed. Credit Union*, No. 15-CV-483 (MMD) (WGC), 2016 WL 3457009, at *3 (D. Nev. June 22, 2016).

Thus, the Court finds that Plaintiff has stated a breach of contract claim based on the imposition of overdraft fees on APPSN transactions, and denies Defendant's motion to dismiss as to that claim.

## II.     Plaintiff's Breach of the Implied Covenant of Good Faith and Fair Dealing Claim

Defendant argues that Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is redundant. (*See, e.g.*, Def.'s Supp. Letter, Dkt. 46, at 1–2.) The Court agrees. "Under New York law, all contracts contain an implied covenant of good faith and fair dealing." *Perks*, 2020 WL 1272246, at *3 (citing *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011)). "Ordinarily, the covenant of good faith and fair dealing is breached where a party has complied with the literal terms of the contract, but has done so in a way that undermines the purpose of the contract and deprives the other party of the benefit of the bargain." *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 134 (N.Y. 2008) (internal citation omitted). However, "[a] claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an

14

express provision of the underlying contract." *Perks*, 2020 WL 1272246, at *3 (internal quotation marks and citation omitted); *see also Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) ("New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.") (internal quotation marks, alterations, and citation omitted). Here, Plaintiff's breach of the implied covenant claim relies upon the same facts, *i.e.*, Defendant's imposition of overdraft fees on APPSN transactions, as her breach of contract claim. (*See* Am. Compl., Dkt. 28, ¶¶ 77–84.) Accordingly, the Court having found that Plaintiff has stated a valid breach of contract claim, her claim for breach of the implied covenant of good faith and fair dealing is dismissed. *See Cruz*, 720 F.3d at 125 ("[W]hen a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant.") (citation omitted).

## III.   Plaintiff's New York General Business Law § 349 Claim

Plaintiff brings a § 349 claim against Defendant, arguing that Defendant's overdraft fee policy is "misleading in a material respect, because [Defendant] promised to charge [overdraft] Fees only on transactions that 'overdraw your account' or where insufficient funds exist to 'pay' a given transaction, when in fact [Defendant] assesses overdraft fees even when there is enough money in the account to pay for the transaction at issue." (Am. Compl., Dkt. 28, ¶ 88.) Defendant argues that Plaintiff's claim fails for two reasons. First, it argues that Plaintiff's § 349 claim, a state law claim, is preempted by the Federal Credit Union Act ("FCUA"). (Def.'s Br., Dkt. 35, at 8–10.) Defendant also argues that Plaintiff's § 349 claim fails because Plaintiff has not sufficiently alleged that Defendant engaged in a misleading practice, and has failed to allege damages

independent of her alleged breach of contract claim.  (*Id.* at 7–8; Def.'s Reply Br., Dkt. 37, at 6–7; Def.'s Supp. Letter, Dkt. 45, at 2.)

### A.    Preemption

Defendant argues that Plaintiff's § 349 claim is preempted by the FCUA.  (Def's Br., Dkt. 35, at 8–10.)  "The laws of the United States are 'the supreme Law of the Land[,] . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'"  *Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*, 906 F.3d 41, 49 (2d Cir. 2018) (quoting U.S. Const. art. VI cl. 2), *cert. denied sub nom. Elec. Power Supply Ass'n v. Rhodes*, 139 S. Ct. 1547 (2019).  "Congress therefore may preempt state law through federal legislation."  *Id.*  Specifically,

> [c]ourts have recognized three generalized scenarios where federal law preempts state law: 1) express preemption, where "Congress define[s] explicitly the extent to which its enactments preempt state law"; 2) field preemption, where Congress's regulatory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it" or where an Act of Congress "touches a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject"; and 3) conflict preemption, where state and federal law directly conflict, making it "impossible for a private party to comply with both state and federal requirements" or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 43 (E.D.N.Y. 2014) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990)), *on reconsideration In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*, 14 F. Supp. 3d 99 (E.D.N.Y. 2014); *see also CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993) ("Where a state statute conflicts with, or frustrates, federal law, the former must give way.") (internal citations omitted).  "Federal regulations have no less pre-emptive effect than federal statutes."  *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

Here, Defendant asserts that Plaintiff's § 349 claim is expressly preempted by a regulation promulgated under the FCUA that permits federal credit unions, like Defendant, to "determine the types of fees or charges and other matters affecting the opening, maintaining and closing of a share, share draft or share certificate account." 12 C.F.R. § 701.35(c). That regulation also states that "[s]tate laws regulating such activities are not applicable to federal credit unions." *Id.* Defendant specifically argues that Plaintiff's § 349 claim is preempted because "Plaintiff here alleges that the overdraft fees were improper because [Defendant] incorrectly calculated her balance" when determining whether to assess an overdraft fee. (Def.'s Br., Dkt. 35, at 9–10.) However, Defendant misconstrues Plaintiff's argument. Plaintiff's § 349 claim does not assert that Defendant incorrectly calculated her balance in determining whether to impose an overdraft fee, but rather that Defendant misrepresented the circumstances under which an overdraft fee would be imposed. (*See* Am. Compl., Dkt. 28, ¶ 88; *see also* Pl.'s Opp. Br., Dkt. 38, at 18 ("Plaintiff's position is simply that, having already agreed to contractual terms, Ocean Financial must abide by them; and that Ocean Financial should not be permitted to misrepresent its fee practices in its contract documents.").) Given that Plaintiff's claim is premised on Defendant's misrepresentations regarding its overdraft policy, and not on Defendant's ability to determine or charge these types of fees, the regulatory provision cited by Defendant is inapplicable. Rather, the relevant FCUA regulation states that "[a] Federal credit union shall accurately represent the terms and conditions of its share, share draft, and share certificate accounts in all advertising, disclosures, or agreements, whether written or oral." 12 C.F.R. § 701.35(b). Crucially, this provision does not contain the express preemption language featured in § 701.35(c), on which Defendant relies.

However, Plaintiff's claim might still be preempted if "'compliance with both federal and state regulations is a physical impossibility,' or because the state law 'stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress[.]'" *In re TD Bank, N.A.*, 150 F. Supp. 3d 593, 605 (D.S.C. 2015) (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143 (1963); *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see also Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 31 (1996) (noting that, even if "explicit pre-emption language does not appear, or does not directly answer the question . . . [,] courts must consider whether the federal statute's structure and purpose, or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent.") (internal quotation marks and citations omitted).  This is known as conflict preemption.  Here, the Court does not find that Plaintiff's § 349 claim is preempted.

First, as noted above, Plaintiff's § 349 claim rests on the contention that Defendant's representations about its overdraft fees policies were misleading.  Such a claim is different from the claim that Defendant argues Plaintiff is bringing, *i.e.*, a claim that directly challenges the method by which Defendant decides to impose overdraft fees.  This is a crucial distinction, as courts have only found claims alleging the latter to be preempted, not the former.  *Compare Whittington v. Mobiloil Fed. Credit Union*, No. 16-CV-482 (MAC), 2017 WL 6988193, at *9 (E.D. Tex. Sept. 14, 2017) (finding that plaintiff's claims were preempted when plaintiff "attempt[ed] to use a state consumer law to dictate to a federal credit union what fees it may charge and how it may charge them"), *and Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 725 (9th Cir. 2012) (finding that claims challenging a defendant bank's ability to re-sequence the posting order of transactions were preempted by defendant's "federally authorized power to choose a posting order"), *with Whittington*, 2017 WL 6988193, at *9 n.3 (noting that plaintiff's claims that defendant federal credit union "furnished misleading and false information" and that it "wrongfully assessed overdraft fees despite the availability of sufficient funds" were not

preempted), *and Gutierrez*, 704 F.3d at 727 (finding that claims based on misleading statements in the defendant's overdraft fee policy were not preempted because, "[a]lthough [defendant bank] insists that a state law prohibiting misleading statements necessarily touches on checking accounts, such an expansive interpretation—with no limiting principle—would swallow all laws") (internal quotation marks and citations omitted).

The Court also finds that Plaintiff's § 349 claim is not conflict-preempted because the requirement that a federal credit union comply with § 349, by representing its business practices in a way that is not misleading, neither prohibits any behavior required by the FCUA and its implementing regulations, nor requires Defendant to engage in behavior prohibited by these federal laws. *See In re HSBC BANK*, 1 F. Supp. 3d at 45 ("The New York contract, tort and consumer protection laws upon which the [p]laintiffs based their claims do not prohibit any behavior required by the NBA [National Bank Act] or the OCC [Office of the Comptroller of the Currency] regulations.[10] Nor do such state laws require national banks to do anything prohibited by federal law. National banks can thus simultaneously comply with the state and federal laws at issue.") (quoting *Levin v. HSBC Bank USA, N.A.*, 2012 WL 7964121, at *10 (N.Y. Sup. Ct. June 26, 2012)); *see also In re TD Bank, N.A.*, 150 F. Supp. 3d at 610 ("[B]reach of contract claims *not* premised on unfairness or bad faith theories but on genuine disputes about the terms of the contract and the parties' compliance therewith, fall squarely within that category of state laws that are not

---

[10] In *In re HSBC BANK*, the Honorable Arthur D. Spatt examined whether the National Bank Act ("NBA") preempted a plaintiff's § 349 claim against a defendant bank. 1 F. Supp. 3d at 44–48. Here, given that Defendant is a federal credit union, the FCUA and its implementing regulations are the applicable federal law. However, given the similarities between the two laws, *compare* 12 C.F.R. § 7.4007 (regulations pursuant to the NBA), *with* 12 C.F.R. 701.35 (regulations pursuant to the FCUA), the Court finds that arguments regarding the preemptive effect of the NBA are equally applicable to the FCUA, including Judge Spatt's determination in *In re HSBC BANK* that § 349 claims are not preempted by the NBA.

inconsistent with the deposit-taking powers of national banks because they only *incidentally affect* the exercise of those deposit-taking powers.") (emphasis in original) (internal citation omitted). Similarly, the Court finds that enforcing a prohibition against misleading statements does not interfere with the discretion afforded Defendant under the FCUA and its regulations to determine what types of fees Defendant will charge or how Defendant will disclose those fees. *See Gutierrez*, 704 F.3d at 726 ("Notably, the [California consumer protection law] itself does not impose disclosure requirements but merely prohibits statements that are likely to mislead the public. As a non-discriminating state law of general applicability that does not conflict with federal law, frustrate the purposes of the National Bank Act, or impair the efficiency of national banks to discharge their duties, the [California consumer protection law]'s prohibition on misleading statements under the fraudulent prong of the statute is not preempted by the National Bank Act.") (internal quotation marks and citation omitted); *cf. In re HSBC BANK*, 1 F. Supp. 3d at 48 ("Thus, in this case, the Court finds that inasmuch as the [p]laintiffs seek to impose liability on [defendant bank] for the bank's failure to sufficiently disclose its posting method, that argument is preempted.") (internal citation omitted). !

Accordingly, the Court finds that Plaintiff's § 349 claim is not preempted by the FCUA and will consider whether Plaintiff has adequately stated a claim under that provision of New York law.

### B.     Failure to State a Claim Under § 349

Defendant argues that even if Plaintiff's § 349 claim is not preempted, it should still be dismissed because Plaintiff has failed to adequately state a § 349 claim. "To state a claim under GBL § 349, a plaintiff 'must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff

suffered injury as a result of the deceptive act.'" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014) (quoting *Stutman v. Chem. Bank*, 731 N.E.2d 608, 611 (N.Y. 2000)). "Section 349 on its 'face applies to virtually all economic activity, and its application has been correspondingly broad.'" *McCrobie v. Palisades Acquisition XVI, LLC*, 359 F. Supp. 3d 239, 254 (W.D.N.Y. 2019) (brackets omitted) (quoting *Karlin v. IVF Am., Inc.*, 712 N.E.2d 662, 665 (N.Y. 1999)). "Section 349 is 'directed at wrongs against the consuming public.'" *Id.* (brackets omitted) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995)).

The Court finds that Plaintiff has sufficiently alleged all three elements of her § 349 claim. First, "[t]o establish that conduct is 'consumer-oriented,' a plaintiff must establish that 'the conduct at issue potentially affects similarly situated consumers.'" *Kelly v. Cmty. Bank, N.A.*, No. 19-CV-919 (MAD) (CFH), 2020 WL 777463, at *9 (N.D.N.Y. Feb. 18, 2020) (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010)). "Although consumer-oriented conduct does not require a repetition or pattern of deceptive conduct, a plaintiff must 'demonstrate that the acts or practices have a broader impact on consumers at large.'" *Wilson*, 625 F.3d at 64 (quoting *Oswego Laborers' Local 214 Pension Fund*, 647 N.E.2d at 745–46). Here, Plaintiff's claim stems from the representations made by Defendant in its standard Contract as well as its Opt-In Form. Plaintiff's allegations amply support a plausible inference that Defendant's conduct has "a broader impact on consumers at large" and is thus consumer-orientated. *Kelly*, 2020 WL 777463, at *9; *Costoso v. Bank of Am., N.A.*, 74 F. Supp. 3d 558, 575 (E.D.N.Y. 2015) (noting that plaintiff "has plausibly alleged consumer-oriented conduct" when the conduct was "based on an Account Agreement the [d]efendant uses with all of its deposit account customers") (citing *Makuch v. N.Y. Cent. Mut. Fire Ins. Co.*, 785 N.Y.S.2d 236, 238 (App. Div. 2004)); *Exxonmobil Inter-America,*

21

*Inc. v. Advanced Info. Eng'g Servs.*, 328 F. Supp. 2d 443, 449 (S.D.N.Y. 2004) ("[Section] 349 liability attaches primarily where a party's misrepresentations are boilerplate and have the potential to be repeated in order to deceive numerous similarly situated buyers.").

"As to the second element [of § 349], whether a representation or an omission, the deceptive practice must be likely to mislead a reasonable consumer acting reasonably under the circumstances." *Heskiaoff v. Sling Media, Inc.*, 719 F. App'x 28, 31 (2d Cir. 2017) (summary order) (internal quotation marks, alterations, and citation omitted). "It is not necessary under [Section] 349 that a plaintiff establish the defendant's intent to defraud or mislead." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 124 (2d Cir. 2017) (internal quotation marks, alterations, and citation omitted). "Rather, the term 'deceptive practice' in Section 349 [has been] interpreted to mean acts which are dishonest or misleading in a material respect." *Kelly*, 2020 WL 777463, at *9 (internal quotation marks and citation omitted). Here, Plaintiff alleges that the Contract and Opt-In Form materially mislead a reasonable consumer into thinking that Defendant will only assesses overdraft fees when transactions overdraw a customer's account, when that is not the case in practice. (*See* Pl.'s Opp. Br., Dkt. 38, at 16.) This is sufficient to allege that Defendant's conduct is materially misleading. *See Kelly*, 2020 WL 777463, at *6, 9 (finding that "[d]efendant's representation in the Account Agreement and associated documents," which defined "an overdraft as occurring when you do not have enough money in your account to cover a transaction, but we cover the transaction on your behalf[,]" "while not intentionally misleading, could mislead a reasonable consumer acting reasonably under the circumstances" to "understand that overdraft fees will not be charged on phantom transactions[11] because such

---

[11] Phantom transactions "occur when a company deposits and then immediately withdraws a small amount of money in order to verify the existence of the account." *Kelly*, 2020 WL 777463, at *6 (record citation omitted).

transactions include the funds necessary to cover the charge"); *see also Kronenberg v. Allstate Ins. Co.*, No. 18-CV-6899 (NGG) (JO), 2020 WL 1234603, at *3 (E.D.N.Y. Mar. 13, 2020) ("[C]ourts have generally held that since the materially misleading conduct factor requires a reasonableness analysis best suited for a jury, it cannot be resolved on a motion to dismiss.") (internal quotation marks, alterations, and citation omitted).

Defendant argues that Plaintiff fails to sufficiently allege this prong of her claim because "an interpretation of a contract 'is not deceptive simply because it is mistaken.'" (Def.'s Br., Dkt. 35, at 8 (quoting *Shapiro v. Berkshire Life Ins. Co.*, 212 F.3d 121, 127 (2d Cir. 2000)).) Defendant's reliance on *Shapiro* is inapposite. In *Shapiro*, plaintiff alleged that a defendant insurance company violated § 349 by "fail[ing] to make a sufficient investigation of his total disability claim before denying it." 212 F.3d at 127. The Second Circuit noted that the defendant's denial of the claim was "not deceptive simply because it [was] mistaken" as a result of a faulty investigation, and noted that there was "no evidence in the record that [the defendant] 'sold disability insurance it never intended to provide.'" *Id.* (quoting *DiDonato v. INA Life Ins. Co. of N.Y.*, No. 99-CV-470 (JSM), 1999 WL 436444, at *1 (S.D.N.Y. June 24, 1999)). Notably, in *DiDonato*, a case on which *Shapiro* relies, the court found that the plaintiff had adequately stated a § 349 claim, concluding that the "alleged conduct is deceptive because it tricks the consumer into believing he is receiving insurance coverage that he is not." 1999 WL 436444, at *1. Likewise, here, the allegation is not that Defendant mistakenly imposed an overdraft fee,[12] but rather that the Contract and Opt-In Form trick a consumer, even if unintentionally, into believing they will only be assessed an overdraft fee at the time of authorization, when, in fact, Defendant

---

[12] In fact, as discussed *supra*, Defendant denies that the overdraft fees assessed in this instant action are errors. (Def.'s Reply Br., Dkt. 37, at 2 n.1.)

also imposes overdraft fees at the time of settlement, even as to previously authorized debit card transactions.

Finally, Plaintiff has sufficiently alleged that she suffered damages as a result of Defendant's deceptive conduct, *i.e.*, the $56 she was charged in overdraft fees. (*See* Am. Compl., Dkt. 28, ¶¶ 4, 63.)  Defendant, in supplemental briefing, notes that some courts in the Second Circuit have held that, "[a]lthough a monetary loss is a sufficient injury to satisfy the requirement under Section 349, that loss must be independent of the loss caused by the alleged breach of contract." *Kelly*, 2020 WL 777463, at *10 (quoting *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009)).  Defendant argues that Plaintiff alleges the same damages for both her breach of contract and her § 349 claim, and that, therefore, any loss she suffered as a result of Defendant's allegedly deceptive conduct is not independent of the loss she suffered as a result of Defendant's alleged breach of the Contract.  (Def.'s Supp. Br., Dkt. 45, at 2.)

"However, in a recent case, *Nick's Garage, Inc. v. Progressive Casualty Insurance Co.*, 875 F.3d 107 (2d Cir. 2017), the Second Circuit emphasized that no such broad requirement [to state independent damages for a § 349 claim] exists under New York law." *Donnenfeld*, 333 F. Supp. 3d at 224.  In *Nick's Garage*, the Second Circuit found that a plaintiff had adequately alleged a § 349 claim even though the damages alleged for his § 349 claim were the same as those alleged for his breach of contract claim.  *Compare Nick's Garage*, 875 F.3d at 114 (describing plaintiff's breach of contract damages), *with id.* at 125 (describing plaintiff's § 349 claim damages).  Here, Plaintiff does not allege damages related to the purchase price of the Contract, but rather that she was charged fees pursuant to the Contract that, but for Defendant's deceptive conduct, she would not have been charged.  This is more akin to damages related to overpaying for an item as a result of a defendant's deceptive conduct, a type of injury that is sufficient to state a § 349 damages

24

claim.  *See Donnenfeld*, 333 F. Supp. 3d at 223 ("Numerous courts in the Second Circuit have concluded that this [§ 349 injury] requirement may be satisfied in the form of an overpayment or price premium, whereby a plaintiff pays more than she would have but for the deceptive practice.") (internal quotation marks and citation omitted) (collecting cases).  The Court therefore finds that Plaintiff's stated damages, even though they are the same as the alleged damages for her breach of contract claim, are sufficient to allege an injury for her § 349 claim.

Accordingly, the Court finds that Plaintiff has adequately stated a claim pursuant to § 349 and denies Defendant's motion to dismiss as to this claim.

## IV.    Plaintiff's Regulation E Claim

Finally, Plaintiff brings a claim asserting a violation of EFTA's Regulation E, which requires a financial institution to provide notice, in writing, of that institution's overdraft service and provide a reasonable opportunity for the customer to affirmatively opt into such a service. (Am. Compl., Dkt. 28, ¶ 94.)  Defendant argues that Plaintiff's claim fails because there is no private right of action under Regulation E, and that Defendant's purported breach of the Contract is insufficient to allege a claim under Regulation E.  (Def.'s Br., Dkt. 35, at 10–12; Def.'s Reply Br., Dkt. 37, at 8–9.)

### A.    Private Right of Action

Defendant argues that Plaintiff cannot bring a claim alleging a violation of EFTA's Regulation E because that regulation does not have a private right of action.  (Def.'s Br., Dkt. 35, at 11–12.)  "A regulation, by itself, may not create a private right of action."  *Sofia v. Esposito*, No. 17-CV-1829 (KPF), 2019 WL 6529432, at *6 (S.D.N.Y. Dec. 4, 2019) (citing *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("[P]rivate rights of action to enforce federal law must be created by Congress.")).  "Language in a regulation may invoke a private right of action that

Congress through statutory text created, but it may not create a right that Congress has not." *Abrahams v. MTA Long Island Bus*, 644 F.3d 110, 117–18 (2d Cir. 2011) (citing *Alexander*, 532 U.S. at 291). Therefore, to determine whether a private right of action exists under a regulation, a court must look to the statute under which the regulation is promulgated. *See, e.g.*, *Abrahams*, 644 F.3d at 118; *Sofia*, 2019 WL 6529432, at *6. If "the regulation applies—but does not expand— the statute," then the statute's private right of action extends to its regulations. *Abrahams*, 644 F.3d at 118. "In other words, a right of action can extend no further than the personal right conferred by the plain language of the statute." *Taylor ex rel. Wazyluk v. Hous. Auth. of the City of New Haven*, 645 F.3d 152, 153 (2d Cir.2011) (internal quotation marks and citations omitted).

Plaintiff relies on 12 C.F.R. § 1005.17, a provision of Regulation E that is promulgated pursuant to EFTA. (Am. Compl., Dkt. 28, ¶ 94.) "The 'primary objective' of the Electronic Fund Transfer Act, 15 U.S.C. § 1693, *et seq.*, is to protect individual consumer rights by 'provid[ing] a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems.'" *Archbold v. Sols. Fed. Credit Union*, No. 12-CV-364 (RJA), 2012 WL 5617845, at *2 (W.D.N.Y. Nov. 15, 2012) (quoting 15 U.S.C. § 1693(b)). "EFTA provides a private right of action for violations of the EFTA that includes recovery of actual damages, a mandatory-minimum statutory penalty of $100 and a maximum penalty of $1,000, costs, and attorney's fees." *Id.* (citing 15 U.S.C. § 1693m). Given that EFTA contains an explicit private right of action, the Court must look to the regulatory provisions relied upon by Plaintiff to determine if they apply, rather than expand, EFTA's statutory language. *See Abrahams*, 644 F.3d at 118 (noting that, in deciding whether a statute's authorization of a private of action extends to its regulations, court must determine whether "the regulation applies—but does not expand—the statute").

26

The regulatory provision at issue here, 12 C.F.R. § 1005.17, states that banks must provide sufficient notice and disclosures to consumers, as well as obtain a consumer's affirmative consent, before charging overdraft fees. *See id.* § 1005.17(b).  It also provides a model form to guide a financial institution's implementation of these regulations in order to ensure that such implementation complies with EFTA. *See id.* § 1005.17(d) ("The notice required by paragraph (b)(1)(i) of this section shall be substantially similar to Model Form A–9 set forth in appendix A of this part, include all applicable items in this paragraph, and may not contain any information not specified in or otherwise permitted by this paragraph.").  Similarly, EFTA's statutory language states that "the purpose of this subchapter [is] to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." 15 U.S.C. § 1693(b).  EFTA also specifically requires that "[t]he terms and conditions of electronic fund transfers involving a consumer's account shall be disclosed at the time the consumer contracts for an electronic fund transfer service, *in accordance with regulations of the [Consumer Financial Protection] Bureau [("CFPB")]*."  15 U.S.C. § 1693c (emphasis added).  EFTA further provides that the CFPB will issue "model clauses for optional use by financial institutions to facilitate compliance with the disclosure requirements of section 1693c of this title and to aid consumers in understanding the rights and responsibilities of participants in electronic fund transfers by utilizing readily understandable language."  15 U.S.C. § 1693b(b).  The Court finds that overdraft fees are part of the terms and conditions that banks may place on electronic fund transfers.  Therefore, the Court finds that 12 C.F.R. § 1005.17, which merely provides further details as to how a bank must disclose these fees and model language as to how a bank shall communicate those disclosures to consumers—so as to facilitate and ensure compliance with EFTA's statutory requirements—only applies, rather than expands, EFTA's provisions. *Cf. Alexander*, 532 U.S. at 280–86 (finding that

27

a regulation that prohibited disparate impact did not retain a statute's private right of action when the statute only prohibited intentional discrimination); *Abrahams*, 644 F.3d at 118–20 (finding that a regulation that required ongoing public participation in the development of a public entity's paratransit system did not retain the Americans with Disability Act's private right of action because the statutory language only required the public entity to solicit public participation when it was creating an initial paratransit system plan).  Accordingly, the Court finds that EFTA's private right of action extends to the provisions of Regulation E, including 12 C.F.R. § 1005.17.

Defendant's arguments to the contrary are unavailing.  First, Defendant argues that § 1693h of EFTA "provid[es] for [the] liability of financial institutions, in specific limited circumstances, where there is a failure to make an electronic fund transfer or failure to stop payment when instructed to do so."  (Def.'s Br., Dkt. 35, at 12.)  However, Defendant overlooks that, in addition to listing specific instances where a financial institution might be liable, § 1693h also states that a financial institution may held liable "as otherwise provided in regulations of the [CFPB]."  15 U.S.C. § 1693h(a)(1)(E).  Moreover, the question of whether a financial institution can be held liable pursuant to the statute and/or its implementing regulations is different than the question of whether a private citizen has the right to bring such an action.  Defendant also argues that Regulation E "states that '[c]ompliance with Regulation E is enforced in accordance with section 918 of' the Electronic Funds Transfer[] Act."  (Def.'s Br., Dkt. 35, at 12.)  Section 918 provides for administrative enforcement of EFTA.  *See* 15 U.S.C. § 1693*o*.  However, as mentioned *supra*, EFTA also provides for enforcement of its provisions via civil and criminal liability.  *See id.* §§ 1693m, 1693n.  Though Regulation E specifically refers to administrative enforcement, rather than enforcement via civil or criminal procedures, it does not state that enforcement of these regulations must proceed *exclusively* via administrative enforcement.  Given that Section 918 of

EFTA lays out specific details as to how administrative agencies, such as the CFPB, can enforce EFTA, *see* 15 U.S.C. § 1693*o*, the Court does not find that the specific reference to administrative enforcement laid out in the regulations promulgated by the CFPB was meant to limit enforcement of the regulations to administrative actions.  Rather, the Court finds that this aspect of Regulation E merely highlights that the administrative agency, promulgating regulations it would enforce, was aware of the limitations on its enforcement power.  In light of the fact that Congress included a private right of action in the statute itself, 15 U.S.C. § 1693m, and specifically mentioned that liability under the statute extends to violations of regulations promulgated pursuant to that statute, *id.* § 1693h, the Court does not find that the failure of the regulations to specifically mention a private right of action is sufficient for a finding that such a private right does not exist.[13]  *See Alexander*, 532 U.S. at 284 (2001) ("A Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well.").

Therefore, given that the Court finds that the implementing regulations of EFTA, *i.e.*, Regulation E, may be enforced through a private right of action, the Court will consider whether Plaintiff has adequately stated a claim for a violation of 12 C.F.R. § 1005.17.

_____

[13] Defendant relies on *M.F. v. State of N.Y. Exec. Dep't Div. of Parole*, 640 F.3d 491(2d Cir. 2011), and *Lopez v. Jet Blue Airways*, 662 F.3d 593, 597 (2d Cir. 2011) to support its argument that the Court should not infer a private right of action into Regulation E where one is not explicitly stated.  (Def.'s Br., Dkt. 35, at 11–12; Def.'s Supp. Br., Dkt. 42, at 4.)  However, both of these cases address whether there is an implied right of action in a *statute*.  *See M.F.*, 640 F.3d at 495 ("Because neither the [Interstate Compact for Adult Offender Supervision] nor the federal statute that authorizes it contains an express private right of action, we must determine whether such a right is implicit in them.") (citation omitted); *Lopez*, 662 F.3d at 597 ("The statute does not expressly provide a right to sue the air carrier, and that right should not be implied because the statute provides an administrative enforcement scheme designed to vindicate fully the rights of disabled passengers.").  Here, EFTA expressly contains a private right of action.  Neither *M.F.* nor *Lopez* address whether a statute's express right of action extends to a regulation that provides for administrative enforcement, and neither are therefore relevant to the Court's analysis.

### B.      Failure to State a Claim under Regulation E

Plaintiff alleges that Defendant violated Regulation E by failing to provide Plaintiff with an accurate description of its overdraft program on the Opt-In Form.  (Am. Compl., Dkt. 28, at 19–20; *see also* Pl.'s Opp. Br., Dkt. 38, at 19–20.)  Regulation E defines "overdraft service" as "a service under which a financial institution assesses a fee or charge on a consumer's account . . . when the consumer has insufficient or unavailable funds in the account."  12 C.F.R. § 1005.17(a). The "Opt–In Rule" of Regulation E states that "a financial institution . . . shall not assess a fee or charge . . . pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the consumer with a notice in writing . . . describing the institution's overdraft service"; and "(ii) [p]rovides a reasonable opportunity for the consumer to affirmatively consent[.]"  12 C.F.R. § 1005.17(b).

Here, Plaintiff argues that Defendant has violated Regulation E because the Opt-In Form states that a customer, if they do not opt in to Defendant's overdraft service, "will not be able to withdraw at an ATM, perform debit card transactions or pay overdrafts on [her] checking [account] when the funds are not available."  (Am. Compl. Ex. B, Dkt. 28-2.)  Plaintiff argues that this language implies that overdrafts occur at the time of authorization, when, in practice, Defendant also charges overdraft fees at the time of settlement, something which the Opt-In Form does not mention.  (Am. Compl., Dkt. 28, ¶¶ 37–38.)  As a result, Plaintiff asserts, the Opt-In Form fails to provide an accurate description of Defendant's overdraft policy as required by Regulation E.  (Pl.'s Opp. Br., Dkt. 38, at 19–20.)  The Court finds that these allegations are sufficient to state a violation of Regulation E.  *See Walker v. People's United Bank*, 305 F. Supp. 3d 365, 376 (D. Conn. 2018) (finding that plaintiff had sufficiently alleged a violation of Regulation E where the Opt-In Form stated that an overdraft fee would be collected when there was not enough money in a customer's

account, but, in practice, the defendant bank also collected overdraft fees when a customer's bank account did have enough money to cover the transaction at issue).

Accordingly, Defendant's motion to dismiss is denied as to Plaintiff's Regulation E claim.

## CONCLUSION

For the reasons stated above, Defendant's motion to dismiss is granted in part and denied in part.  Specifically, the Court grants Defendant's motion as to Plaintiff's claim for breach of the implied covenant of good faith and fair dealing, and dismisses that claim.  However, the Court denies Defendant's motion as to Plaintiff's breach of contract, § 349, and Regulation E claims. Those claims will proceed to discovery.

                              SO ORDERED.

                              */s/ Pamela K. Chen*
                              Pamela K. Chen
                              United States District Judge

Dated: April 22, 2020
          Brooklyn, New York